# EXHIBIT 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ARLESS C. HUDSON and THE ACH SUNRISE TRUST | § § § | NO. 05CH16850 |
| PLAINTIFFS, | § § § § | PLAINTIFFS' ORIGINAL COMPLAINT |
| vs. | § § § | PLAINTIFFS DEMAND TRIAL BY JURY |
| DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., D/B/A DEUTSCHE BANK ALEX. BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC.; DAVID PARSE; CRAIG BRUBAKER; MATT COLNON; BANC ONE INVESTMENT ADVISORS CORPORATION; BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO.; AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO; SCOTT DEICHMANN; JEFFREY CONRAD; WHITE & CASE, LLP; and JOHN OHLE, III, | § § § § § § § § § § § § § § | |
| DEFENDANTS. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Arless C. Hudson ("Hudson") and the ACH Sunrise Trust ("ACH") (sometimes

collectively referred to as the "Plaintiffs") bring this action against Defendants Deutsche Bank

AG; Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche

Bank Securities, Inc.; David Parse; Craig Brubaker; Matt Colnon, Banc One Investment

Advisors Corporation; Bank One Corporation n/k/a JP Morgan Chase & Co.; American National

Bank and Trust Company of Chicago ("American National Bank"); John Ohle, III; Scott

Deichmann; Jeffrey Conrad; and White & Case, LLP (all defendants are sometimes collectively

referred to as the "Defendants"), seeking damages for claims arising out of tax strategies of the

type further described herein, and state:

# I.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction under 735 ILCS 5/2-209 in that the Defendants are present and transact business in this State and committed tortious acts within this State, all as more fully described herein below.

2.     Venue is proper under 735 ILCS 5/2-101 in that numerous of the Defendants are residents of Cook County and Cook County is where a substantial part of the transactions occurred out of which this cause of action arose.

3.     This Court has personal jurisdiction over each of the Defendants. Each of the Defendants either has its principal place of business in the State of Illinois, has committed a tort in whole or in part in Illinois, or has otherwise done business in Illinois, all as more fully described herein below.

# II.

## PARTIES

4.     Plaintiff Arless C. Hudon is an individual and citizen of Florida. At all times relevant to this proceeding, however, she was a resident of Illinois.

5.     Plaintiff The ACH Sunrise Trust is a grantor trust governed by the laws of the State of Illinois.

6.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German corporation with its principal place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. This Defendant may be served with process through its

2

registered agent, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

7.     Defendant Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown ("DB Alex Brown") is a Delaware corporation with its principal place of business at 31 West 52nd Street, New York, New York, 10019. Deutsche Bank Securities, Inc. is a member of the New York Stock Exchange. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. This Defendant may be served with process through its registered agent, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

8.     Defendants David Parse ("Parse") and Craig Brubaker ("Brubaker") are individuals and citizens of Illinois and Texas, respectively. These Defendants were during the relevant period each an employee, officer, agent or representative of Deutsche Bank and/or DB Alex. Brown. These Defendants are continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and have agents doing business in the State of Illinois. Parse, Brubaker, Deutsche Bank, and DB Alex. Brown are sometimes collectively referred to herein as the "Deutsche Defendants".

9.     Defendant Banc One Investment Advisors Corporation merged into and was succeeded by JP Morgan Chase & Co. effective on or about July 1, 2004. Defendant Bank One Corporation merged into and was succeeded by JP Morgan Chase & Co. effective on or about September 29, 2004.     JP Morgan Chase & Co. is a Delaware corporation with its principal office located at 270 Park Avenue, New York, New York. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. This

3

Defendant may be served with process through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. American National Bank, Banc One Investment Advisors Corporation, Bank One Corporation and JP Morgan Chase & Co. herein collectively referred to as "Bank One".

10.     Defendant American National Bank was, at the time of the events set forth herein, an Illinois Corporation, with its principal office located at 120 LaSalle Street, Chicago, Illinois 60603. Defendant American National Bank subsequently merged into and was succeeded by Bank One Corporation and/or Banc One Investment Advisors Corporation.

11.     Defendant John Ohle, III ("Ohle") is an individual and citizen of Illinois. This Defendant is, or was during the relevant period, an employee of American National Bank and Bank One.

12.     Defendant Matt Colnon ("Colnon") is an individual and a citizen of Illinois. This Defendant is, or was during the relevant period, an employee of American National Bank and Bank One.

13.     Defendant Scott Deichmann ("Deichmann") is an individual and citizen of Illinois. This Defendant is, or was during the relevant period, an employee of Bank One.

14.     Defendant Jeffrey Conrad ("Conrad") is an individual and citizen of Illinois. This Defendant is, or was during the relevant period, an employee of Bank One. Ohle, Colnon, Deichmann, Conrad and Bank One are collectively referred to as the Bank One Defendants.

15.     Defendant White & Case, LLP ("White & Case") is a Delaware corporation with its principal place of business at 1155 Avenue of Americas, New York, New York 10036. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. This Defendant may be served with process through its

4

registered agent The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

## III.

## BACKGROUND FACTS

A. THE DEVELOPMENT OF THE SCHEME TO SELL DIGITAL OPTIONS

    1. <u>About Deutsche Bank, DB Alex Brown, Jenkens & Gilchrist, Bank One n/k/a JPMorgan Chase, and White & Case</u>

    16.    Deutsche Bank, founded in 1870, is a joint stock company principally dedicated to financing foreign trade.[1] Deutsche Bank does business in major financial and banking markets in Germany, Europe and the rest of the world; and, as of December 31, 2002, had total assets of approximately $1.25 trillion. Deutsche Bank offers various investment, financial and related products and services to consumer and corporate clients worldwide. Deutsche Bank has roughly 67,700 employees and more than 13 million customers in 76 countries worldwide; more than half of Deutsche Bank's staff works outside of Germany.

    17.    Deutsche Bank claims to provide its private clients with all-round service extending from account-keeping and cash and securities investment advice to asset management. In addition, Deutsche Bank claims to have a leading position in international foreign exchange, fixed-income and equities trading.

    18.    Deutsche Bank holds itself out to be a pre-eminent provider of liquidity in the world's foreign exchange markets and a recognized leader in all aspects of foreign exchange. According to its website, it is consistently ranked as one of the top three global foreign exchange

---

[1] All of the information set forth in this section is taken from the websites of Deutsche Bank, Jenkens & Gilchrist, Amex and Bank One. *See* <http://www.db.com/>*Welcome to Deutsche Bank* (last visited February 27, 2004); http:\www.jenkens.com\jenkens\aboutjenkens.asp>*About Jenkens* (last visited May 16, 2003; <www.americanxpress.com> (last visited July 24, 2004); <http://www.jpmorganchase.com>; <https://www.bankone.com>, and <https://www.whitecase.com>.

5

providers by *Euromoney* Magazine's industry standard annual Foreign Exchange Poll, both in terms of client perception and market share.

19.     Deutsche Bank's Foreign Exchange claims to be committed to the core values of client focus and innovation that allegedly characterize all its wholesale client businesses. It emphasizes its ability to find the most creative solution available to *individual* client problems.

20.     Deutsche Bank claims that its foreign exchange options franchise is unsurpassed among major players. It further states that its options desk is fully integrated with all parts of its global foreign exchange operations, giving clients 24-hour access to a world of *speculative and hedging* opportunities.

21.     At the time of the events in question, Jenkens & Gilchrist, P.C. ("Jenkens")[2] was a large law firm with over six hundred (600) attorneys and offices in nine (9) major cities throughout the United States, including Chicago, Illinois.  It claims expertise in a variety of industries and market segments, including Anti-Trust, Bankruptcy, Construction, Securities, Financial Institutions, Financial Services, Environmental, Franchise and Distribution, Health, Immigration, Intellectual Property, International Tax, Litigation, Technology, and Real Estate Law.

22.     At the time in question, Bank One was one of the nation's largest banks and the world's largest Visa card issuer.  In 2002, Bank One had $290 billion in assets, $3.3 billion in net income, and 71,200 employees.  Bank One marketed its family wealth (including tax strategies) through Banc One Investment Advisors.  In July 2004, Bank One merged with JPMorgan Chase to form this nation's second largest bank, with $1.1 trillion in assets and 2,300 branches in seventeen states.

---

[2] Jenkens is not a Defendant in this case due to the approval of an $81.55 million class action settlement against

23.   White & Case was founded in 1901 and has lawyers in 25 countries, including the United States and countries throughout Latin America, Europe, the Middle East, Africa and Asia. It bills itself as an "international" firm with a "commitment to each region of the world." It claims to "move quickly, efficiently and with substantial knowledge of the differing terrains to complete deals, mitigate problems, obtain information and resolve complexities simultaneously in many places and across numerous dimensions." White & Case markets itself as "distinguished by the depth and scope of legal services it provides to clients."

### 2.   **About Options**

24.   An option gives a buyer the right to buy or sell something at a definite price for a definite period of time, regardless of that something's then market price on the open market. That "something" may be stock, bonds, commodities (such as coffee or pork bellies), or intangible market valuations such as the Standard & Poors composite value. Options are said to be "in the money" if the price of the underlying "something" makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or a loss. While options were originally primarily developed as a "hedge" against declines in other investments, "plain vanilla" options have spawned a host of derivatives which sometimes hang by only a slender thread from any underlying investment or in some cases not at all.

25.   Options may be either "American-style" or "European-style," depending upon whether the option purchaser has the right to exercise the option at any time before expiration or *only upon* the designated expiration date. For example, assume an investor buys a "call" option on 1000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16,

---

them in the Southern District of New York.

2003. This option gives the investor the right to purchase 1000 shares of ABC for $100. Under an American-style option, the option holder can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2003. Under a European-style option, however, the option holder can only elect to exercise the option on July 16, 2003.

26.     Digital Options are "digital" in the sense that the investor wins or loses a pre-determined amount in full, *but only* if the strike price is met—thus, the option is either on or off, like a digital (binary) 1 or 0. As a result, Digital Options provide an investor with the same payout no matter how far above the strike price the underlying price goes. For example, a Digital Option may look as follows: an investor will receive $1,000 if ABC Corp. closes at or above $12 per share on June 24, 2003. If the price of ABC Corp. is at or above $12 per share on the closing date, the investor is paid $1,000. If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. No matter the outcome, however, stock in ABC Corp. never changes hands. Digital Options are, in reality, nothing more than wagers that a certain commodity or equity price will be at or beyond (or beneath) a given price on a certain date.

27.     Digital Options are ordinarily less expensive to purchase than standard options. A Digital Option price is influenced by many of the same factors as any other option, such as the price of the underlying commodity, the exercise price, the time to maturity, the volatility of the underlying commodity, and short-term interest rates. A key disadvantage of Digital Options is a limited profit potential.

3.     **Defendants Develop a Plan to Market Options as a Tax Strategy**

28. A plan to market options—initially digital options on foreign currency[3]--as a tax strategy was developed by the Deutsche Defendants, Jenkens, Ernst & Young, BDO Seidman and others[4] (collectively, the "COBRA Participants") in the mid-to-late-90s. Upon information and belief, the participants included Paul Daugerdas, a partner at Jenkens, and Parse, Dan Brooks, and certain other unknown individuals with the Deutsche Defendants. Prior to 1994, Daugerdas was employed by Arthur Anderson as *inter alia* the Partner in charge of the Futures and Options Tax Practice. From 1994 to December 28, 1998, he was a partner at the law firm of Altheimer & Gray in Chicago, Illinois, where he was Chairman of its Tax Department. Since December 29, 1998, Daugerdas has been a Partner in Jenkens' Chicago office (he continues to be "of counsel" to that firm). Upon information and belief, Parse and Daugerdas had a professional and social relationship for many years before the HOMER[5] Strategy at issue in this case was designed and marketed.

29. From 1991 until October 1999, Daugerdas apparently marketed a tax strategy in which a prospective client borrows a treasury security, sells the security short, and then contributes the proceeds to a partnership in exchange for a partnership interest. Although the issue is hotly contested,[6] Daugerdas contends that he independently developed the idea of substituting options in place of treasuries sometime in 1995 or 1996. He claims that after the House Ways and Means Committee of the United States Congress proposed legislation in October of 1999 that would, if passed, adversely impact the use of treasuries in the short-sale

---

[3] As explained below, Plaintiffs purchased options on the bonds of foreign governments—denominated of course in the foreign currency of that foreign government--instead of directly on foreign currency itself.
[4] To the best of Plaintiffs' information and belief, the Bank One Defendants were not involved in the COBRA and related strategies.
[5] Homer is the acronym for "Hedge Option Monetization of Economic Remainder", which is the tax strategy engaged in by Plaintiffs. According to Daugerdas, he came up with this acronym as a corollary to BART, Bank One's original name.
[6] *See The Diversified Group, Inc vs. Daugerdas and Jenkens & Gilchrist,* 139 F. Supp.2d 445 (S.D.N.Y. 2001).

strategy, he began to employ various option strategies for his clients.

30.   The initial option strategy sold by Daugerdas is where the taxpayer would purchase and sell options, and then transfer the option positions to a partnership. As a result, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of the purchased options, but is not reduced by the taxpayer's obligation with regard to the options written. The use of European-style digital options in this transaction is essential because it permits significant leverage to be obtained at relatively modest cost and minimum risk.

31.   Indeed, to hold the risk and the resulting profit potential to a minimum in those early transactions, the COBRA Participants structured the FX Contracts as follows: Each client entered into two opposing transactions[7] - one where the client would be PAID if the spot rate on a particular foreign currency[8] was at or above a certain rate, and one where the client would have to PAY OUT if the spot rate was at or above a certain rate. The two rates that were set (one where the client would be PAID and one where the client would PAY OUT) were different by only *fractions of a penny*. On all of the FX Contracts, the trigger[9] occurred when the spot rate on the underlying currency pair (Japanese Yen vs. U.S. Dollar, Euro vs. U.S. Dollar, or Canadian Dollar vs. U.S. Dollar) was at or above a specific spot rate *on a certain date at a certain time*. Thus, there was almost no chance of only one position being acted upon. Either the spot rate would be above both, so both were acted upon, or the spot rate would be below both, so neither

---

[7] The two transactions, although purportedly independent, were actually neither independent nor even transactions. Each client and the Deutsche Defendants entered into one form contract memorializing both what was bought and what was sold, and without providing further collateral the client could not transfer the positions separately. Further, the FX Contracts were not something traded on any recognized exchange but were simply a matter of private contract between the participants. Finally, neither party had any rights to take possession of the "underlying currency." As a result, the FX Contracts amounted, in actuality, to a contractual wager (*i.e.*, a "bet") based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands between the parties.

[8] Foreign currency was used so that the loss claimed could be either capital or ordinary, depending on the need, under § 988 of the Internal Revenue Code.

[9] The "trigger" is an event that causes a payoff with respect to digital options.

were acted upon.

32.    To further ensure control of the transaction (that either both or neither one were acted upon), the ability to determine when and if the event was triggered was retained by Deutsche Bank, with the stipulation that Deutsche Bank, as the "calculation agent", could choose to accept or disregard any spot rate.  When you combine these two elements - the incredibly close proximity of the trigger spot rates (hundredths of a penny apart) and the ability to choose the spot rate that determines if the trigger occurred - the transactions had virtually no risk of just one of the paired transactions being exercised.  Buried in a footnote in some, but not all, of Jenkens' opinion letters issued after the transaction was completed, Jenkens referred to the small chance of this occurring as "lottery-type" winnings.

33.    The participants in these early strategies structured the tax strategies so that the total of fees to them and others was between five and one-half percent (5.5%) and nine and one-half percent (9.5%) of the tax savings the client desired to achieve.  Of this amount, between one percent (1%) and five percent (5%) went to the Deutsche Defendants as the "spread" between the two positions in the FX Contract (*i.e.*, the difference between what was paid for buying one position and what was received for selling the other), three percent (3%) went to Jenkens for having "developed" the FX Contract as a tax strategy and writing an opinion letter on the transaction,[10] and one and one-half percent (1.5%) went to others (the "Marketing Participants"), who participated in the transaction by introducing and recommending the FX Contracts, as part of various tax strategies, to long-time clients who trusted them.  The Marketing Participants included *inter alia* Ernst & Young, BDO Seidman, and many others.  Indeed, in some instances, the tax strategies were marketed and promoted directly by Jenkens and sometimes by Deutsche

---

[10] Exclusive of any amount paid for an opinion letter from someone other than Jenkens.  Jenkens paid roughly

Bank as its proprietary strategy. The FX Contract tax strategy was sometimes marketed under *inter alia* the name "COBRA" (*i.e.*, Currency Options Bring Reward Alternatives).

**4.    IRS Notice 1999-59: Transactions Lacking in "Economic Substance" are Illegal**

34.    On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS stated that "[t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for Federal income tax purposes. . . . Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for Federal income tax purposes." The clear message from the IRS to Defendants was that purported losses arising from transactions wholly lacking in "economic substance" (e.g., the COBRA Strategy) are not properly allowable for Federal income tax purposes. This was hardly "news," in that the case of *ACM v. Commissioner*, 157 F.3d 237 (3rd Cir. 1998) (hereafter, the "*ACM* Case"), decided over a year earlier, had held *inter alia* that a loss must reflect *actual* economic consequences (and not, for example, simply a loss bifurcated from an offsetting gain).

**5.    IRS Notice 2000-44: The IRS Contends that the COBRA Strategy is Illegal**

35.    In August 2000, the IRS once again clearly and unequivocally informed accountants and tax attorneys across the country that they believed the COBRA Strategy was illegal. Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This Notice concerned "similar transactions [to those

---

twenty percent (20%) of every dollar it was paid to various other participants in the transaction; often, these

described in Notice 1999-59] that purport to generate tax losses for taxpayers," thus indicating the IRS believed it had also addressed transactions like the COBRA Strategy in Notice 1999-59.

36.    Notice 2000-44 specified the precise transactions marketed by the COBRA Participants, under which the taxpayer purchases call options and simultaneously writes offsetting call options, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes." The clear message from the IRS to the COBRA Participants was that the purported losses arising from the COBRA Strategy were not properly allowable for Federal income tax purposes.

37.    The COBRA Participants represented that the COBRA Strategy was a legal tax shelter despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally stated that the type of transaction their clients undertook, based on the advice and recommendation of the COBRA Defendants, was illegal. The COBRA Participants simply ignored the clearly stated implications of IRS Notices 1999-59 and 2000-44 and, therefore, knowingly deceived and misled their own clients to their detriment.

38.    The COBRA Participants also represented that the COBRA Strategy was not required to be disclosed on the Plaintiffs' respective federal tax returns pursuant to Treas. Reg. § 1.6011-4(a). Further, the COBRA Participants failed to register the COBRA Strategy as a tax

payments were *not* disclosed to the client.

shelter with the Internal Revenue Service pursuant to Treas. Reg. § 301.6111-2 and did not advise their clients that registration of the COBRA Strategy was required.

39.    Unbelievably, the COBRA Participants actually promoted and implemented the Strategy **after** Notice 2000-44 was issued[11] expressly stating that these transactions were illegal and invalid.  Unfortunately, the COBRA Participants did not disclose this important development to their clients because the COBRA Participants knew the Plaintiffs would either request a refund of their fees and end their relationships with the COBRA Participants (for those who entered the Strategy in 1999), or refuse to participate in the Strategy.   Clearly, the COBRA Participants placed their greed over the Plaintiffs' best interest.

6.    **The COBRA Participants Market Variations of the COBRA Strategy**

40.    After Notice 2000-44 was issued, the COBRA Participants began marketing variants of COBRA, all still involving the identical, or almost identical, FX Contracts as before. These new transactions involved such obvious ruses as tying the FX Contracts to a certificate of deposit (referred to as a "market-linked-deposit", which Deutsche Bank designed and actively marketed and implemented), having the client be "redeemed" out of the partnership and receive assets with an allegedly stepped up basis, and renaming the FX Contracts as "swaps" instead of options (which Deutsche Bank played a role in the decision to rename the FX Contracts as "swaps").  In many of these variations, a different type and organization of entities was also utilized.  However, Jenkens & Gilchrist marketed far fewer of these transactions than they had of the COBRAs.

7.    **The Defendants Develop and Market "BART" and "HOMER"**

41.    During this period (when far fewer of these COBRA-derived strategies were

---

[11] The Defendants continued to reassure Plaintiffs, even those who entered the Strategy in 1999, that the COBRA Strategy was valid.

being marketed), Bank One approached Jenkens about a transaction they had developed in-house (in their "Innovative Strategies Group") called a "Basis Adjusted Remainder Trust" or "BART." Specifically, in January 2001, Trey Die of Bank One approached Daugerdas at the Fountainbleau Hotel in Miami Beach, Florida, during the annual Heckerling Institute on Estate Planning, and he and Ohle met with Daugerdas and explained how BART worked. On information and belief, Bank One approached the Jenkens lawyers because Jenkens could not only write an opinion letter purportedly legitimizing the transaction, but also already had a tremendous marketing machine in place to help promote the transaction.

42. In summary, Die and Ohle explained that BART worked by contributing two pairs of options—one pair destined to make money and one pair destined to lose money--to a Grantor Retained Annuity Trust, or "GRAT", and then manipulating the GRAT structure so as to increase basis in an asset the taxpayer wished to sell in the future *without* incurring any actual economic loss. After a number of meetings in which Conrad[12] and others at Bank One fully described the BART strategy, the Jenkens lawyers concluded that the BART strategy was attractive because *inter alia* it was not covered by Notice 2000-44 or any listing requirements. However, they did not believe it was particularly marketable, in that it required the taxpayer to engage in the transaction *prior* to selling the asset giving rise to the gain.

43. As a result, Jenkens and Bank One, over the next few months, reworked the BART strategy, in conjunction with the Deutsche Defendants and their lawyers White & Case,[13] into one that could be used to generate a loss to offset gains that had already occurred, even those involving ordinary losses. The result was a strategy that had the loss from the pair of options that lost money flow out to the taxpayer and the gain from the pair of options that made money

---

[12] Both Ohle and Conrad had previously been part of KPMG's National Tax Office.

flow out to a third party; the mechanics of the HOMER strategy are more fully described in paragraph 67 of this Complaint. Daugerdas named this new strategy "HOMER," in reference to BART and the popular "Simpsons" television cartoon show.

44. Ultimately, Jenkens, Bank One, and Deutsche did only one BART transaction together, but approximately 40 HOMERs, including the ones sold to the Plaintiffs in this case. Jenkens charged a flat fee for each transaction, and then paid Bank One pursuant to a "Service Agreement"; the Deutsche Defendants charged for the options that were integral to the strategy.

45. Defendants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the purchase and sale of the HOMER Contracts (as hereafter defined and described), pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, Defendants made various false statements of material fact, and omitted to state material facts that made statements misleading, to Plaintiffs.

46. The purpose and effect of Defendants' plan, transaction, and course of conduct was to generate huge fees by co-promoting and serving as a counter-party (with respect to the Deutsche Defendants) for the HOMER Contracts as part of an alleged tax-savings strategy.

47. As a result of and in reliance on these misrepresentations, omissions, and promises, the Plaintiffs purchased the HOMER Contracts and engaged in the HOMER Strategy.

48. Had Plaintiffs known of the material adverse information which Defendants did not disclose, they would not have purchased the HOMER Contracts or engaged in the HOMER Strategy.

49. The Defendants owed duties to the Plaintiffs. These duties included the duty to:

---

[13] A major focus of the reworking was the design of the options to be used, and White & Case was heavily involved

- Exercise prudence, caution and care in recommending and entering into the HOMER Contracts for and with the Plaintiffs; and

- Exercise their responsibility to deal fairly and in good faith and their fiduciary responsibilities of care and loyalty to the Plaintiffs.

50.     Defendants intended to deceive the Plaintiffs, as evidenced by the aggressive push the Defendants took to convince the Plaintiffs to enter into the HOMER Contracts and engage in the HOMER Strategy. In combination with the relatively short time the Plaintiffs were given to consider the transactions and the transactions' complete failure to achieve their intended purpose, there is no possible explanation for the Defendants' behavior other than intentional deceit.

51.     It is evident that Defendants chose to defraud the Plaintiffs for personal gain in the form of outrageous fees from unsuspecting "clients." These transactions to defraud were perpetrated through Defendants' discrete acts of misrepresentations, representatives of which are herein alleged.

**B.     DEFENDANTS SOLICIT HUDSON**

    **1.     Defendants Sell the Strategy to Hudson**

52.     Arless Hudson is 82 years old. In October of 2001, Hudson's advisor, Ron Comm ("Comm"), was contacted by Defendant Matt Colnon of Bank One regarding a tax-savings strategy that he believed could help Hudson in reducing her tax liability for the year 2001 from the sale of a business owned by the Hudson family. Colnon explained to Comm that he had a bullet-proof and legitimate strategy for the reduction of Hudson's tax liability and he urged Comm, on behalf of Hudson, to meet with representatives of Deutsche Bank and Bank One. Colnon told Comm that this Strategy was "a phenomenal opportunity" for Hudson and

---

in this along with Deutsche Bank.

"better than anything else that was in the marketplace."

53.     Shortly thereafter, based on Colnon's representations, Hudson agreed to have her representatives meet with the Deutsche and Bank One representatives to discuss the Strategy. Hudson's advisor, Wayne Cooper and Hudson's son, Craig Hudson, as representatives of Hudson,[14] met with Defendants Ohle, Deichmann and Conrad (and others) in later 2001 to discuss the details of the HOMER strategy.  At this time, Ohle gave Hudson's representatives a Bank One brochure titled "Family Wealth Services" (the "Brochure").   According to the Brochure, "[T]he best measure of financial success is … how much you are able to shelter from taxes …"; "[O]nce your plan is complete, they [Bank One Advisors] will work with the other members of your financial advisory team—your attorney, accountant …"; and "[O]ur [Bank One's] Advisors are 'impartial advocates' for your ongoing financial success.  They do not work on commission and are not affiliated with any products or product sales."

54.     At this meeting Conrad discussed the specifics of the various transactions that were to occur.  Conrad, Ohle, and Deichmann assured Hudson's representatives that the Strategy was totally legal and valid and that it had already survived IRS scrutiny.  These Defendants also informed Hudson's representatives that the Strategy was a proprietary strategy of Bank One and that only a few select clients were being given the opportunity to participate in it.  These Defendants then referred Hudson's representatives to Paul Daugerdas at Jenkens & Gilchrist, whom Hudson's representatives were told would prepare an independent opinion letter that would completely insulate Hudson from penalties in the unlikely event of an IRS audit.

---

[14] At all times relevant hereto, Craig Hudson, Comm, and Cooper met with and spoke to the various Defendants on behalf of and as representatives of Ms. Hudson.  The Defendants were aware of this and, in fact, the sole purpose of the Defendants meeting with and making representations to these individuals (as representatives of Arless Hudson) was so that these individuals could then relate to Ms. Hudson what the Defendants were telling her.  In other words, the representations the Defendants made to Ms. Hudson's representatives were intended to and did have the same effect as direct representations to her.

55.    In late November 2001, additional meetings and phone calls to discuss the HOMER Strategy occurred between the Hudson's representatives, Daugerdas, the Bank One Defendants, and others.

56.    During these meetings, these Defendants told Hudson's representatives that that the HOMER Strategy took advantage of a legal "loophole" in the tax code to reduce tax liability, and Jenkens, Bank One and Deutsche Bank had performed many of these identical transactions. Conrad told the Hudson representatives that the fees they paid for the HOMER strategy would not be considered in determining whether there was actually economic purpose to the transaction, because the fees paid to the Bank One Defendants and Jenkens would be ignored as consulting and legal fees.

57.    In fact, regardless of whether economic motive was necessary, the Hudson representatives were told that, in the event the IRS challenged the Strategy, the Jenkens' "independent" opinion letter would uphold the validity of the Strategy, protect Hudson from the IRS, and would prevent the assessment of penalties.

58.    At some point in November 2001, the Bank One Defendants and Daugerdas set up a phone call with the Deutsche Bank Defendants, including Parse and Brubaker. Parse and Brubaker confirmed the legitimacy of the HOMER strategy, and specifically discussed the options on German bonds that were involved. Importantly, Parse and Brubaker informed the Hudson representatives that the Options provided an opportunity to make a profit on the investment.

59.    Based on the foregoing representations and assurances, Hudson agreed to engage in the HOMER Strategy.

19

## 2. Hudson Relied On The Defendants' Expertise

60. Hudson does not have knowledge about complex tax and legal matters. Hudson relied on the Defendants for their "expertise" in this regard.

61. None of the Defendants ever told Hudson or her representatives that Jenkens was providing a legal opinion as to the validity of *a tax shelter it helped develop*, which as a result was not in fact an "independent" opinion letter.

62. The Defendants, including the Deutsche Defendants, discussed all aspects of the HOMER Strategy with Hudson's representatives, including the alleged tax benefits of the strategy. For instance, the Defendants informed Hudson's representatives that by forming a grantor retained remainder trust to engage in the HOMER Strategy, it was possible to create large losses for tax purposes that would largely eliminate or offset their expected substantial income. The Defendants informed Hudson's representatives that economic motive was not a factor in the HOMER Strategy because it was an estate-planning device.

## C. THE FEATURES OF THE HOMER STRATEGY

63. According to a print-out furnished by Jenkens & Gilchrist to Hudson, the steps of the HOMER Strategy were as follows:

> "a. Client purchases a balanced financial position comprised of two partially offsetting European-style digital foreign currency options (the "Options"), each of which hedges the other, with a slight market bias, and each which has a premium cost in an amount roughly equal to the Target tax mitigation amount; Client borrows most funds necessary to enter into the Options (the "Loan");
>
> b. Client contributes the Options to a newly formed Grantor Retained Remainder Trust (the "Trust"), gifting a small unitrust interest (the

20

"Unitrust Interest") to a relative and retaining the remainder interest in the Trust. The Trust should be a "grantor trust" by virtue of Client's having retained the Trust's remainder interest (the "Remainder Interest"). However, the Trust provides for the creation of a power, on some subsequent date, permitting Client to reacquire Trust assets by substituting assets of equal value. Client secures the Loan with the Remainder Interest;

c.    Client sells the Remainder Interest to an unrelated third party (the "Partnership"), for its fair market value, which should roughly equal the Loan. Since Client's basis in the remainder interest is roughly equal to its value, Clients should recognize no material gain or loss upon this disposition. This payment is made with a promissory note (the "Note"). Since Client now does not own a remainder interest in the Trust, the Trust is no longer a grantor trust as to Client. Client secures the Loan with the Note. The Partnership secures the Note with the Remainder Interest;

d.    Client's power to reacquire Trust assets by substituting assets of equal value springs into existence. The Trust is therefore now a grantor trust as to Client;

e.    The loss portion of the Options expires, and this loss flows through to Client;

f.    Client waives the right to reacquire Trust assets by substituting assets of equal value. The Trust is therefore again treated as an independent taxable entity;

g.    The trust terminates, because the Unitrust Interest is purchased by the

21

Partnership, and the Trust is collapsed. Upon termination, the Trust distributes its remaining assets (i.e., the remaining Option) to the Partnership;

h.  The Partnership liquidates, distributing its assets (i.e, the remaining Option) and the obligation on the Note to its partners in liquidation of their interests. This should result in the partners of the Partnership holding the remaining Option with a basis roughly equal to the fair market value of the remaining Option; and

i.  The partners of the Partnership terminate the remaining Option, and use the proceeds to repay the Note."

64.  Each of the steps proposed by the Defendants were fully planned in advance to reduce or eliminate tax liability for Hudson's substantial gain.

65.  The Defendants further advised Hudson's representatives that the precise amount of loss to be generated by the Strategy would be chosen beforehand, but should not be a loss so large that it would offset the income entirely.

66.  The Defendants further advised Hudson's representatives that if the Internal Revenue Service (the "IRS") audited their tax returns as a result of the Strategy, the Jenkens' "independent" opinion letter would confirm the propriety of the Strategy and of claiming the resulting losses on their tax returns. This "independent" opinion letter would enable Hudson to satisfy the IRS auditors as to the propriety of the tax returns.

67.  The Defendants advised Hudson's representatives that the losses created by the Strategy were legitimate and in accordance with all applicable tax laws, rules, and regulations. In particular, the Defendants advised Hudson's representatives that the Strategy was not a "sham

transaction" that would be ignored or disallowed for tax purposes and that the "independent" opinion letter from Jenkens would confirm this.

**D.    HUDSON ENGAGES IN THE HOMER STRATEGY IN 2001**

68.    In approximately November 2001, Hudson agreed to engage in the HOMER Strategy. Her decision was based in large measure upon the Defendants' advice, the promised "independent" opinion letter of Jenkens confirming the propriety of the HOMER Strategy, and the representations and recommendations of the Defendants during the initial HOMER Strategy presentation and thereafter.

**1.    Hudson Forms the HOMER Strategy Entity**

69.    In November 2001, Hudson formed ACH Sunrise Trust (the "Trust") for the purpose of carrying out the HOMER Strategy. The Defendants instructed, advised, and orchestrated the formation of this entity.

**2.    The Foreign Bond Options**

70.    David Parse at Deutsche Bank advised and instructed Hudson to pick the German Government Bonds as the foreign bonds.

71.    On or about November 20, 2001, in accordance with the HOMER Strategy, Hudson, through the Trust (collectively the "Plaintiffs"), entered into four private contracts with Deutsche Bank involving foreign options positions on German Government Bonds. These private contracts with Deutsche Bank required Hudson to purchase (1) a reset bonus knock-out put option with a strike price of 102.85, a cap of 98.45, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 26,734,191.00 Euros of 2 year German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $25,714,260.00 ("Option A"); (2) a reset bonus knock-in put option with a strike price of 102.85, a cap of 98.45, a reset strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of 26,734,191.00 Euros of 2 year

23

German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $25,765,740.00 ("Option B"); (3) a reset bonus knock-out call option with a strike price of 98.45, a cap of 102.85, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 26,734,191.00 Euros of 2 year German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $26,286,260.00 ("Option C"); and (4) a reset bonus knock-in call option with a strike price of 98.45, a cap of 102.85, a reset strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of 26,734,191.00 Euros of 2 year German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $26,233,740.00 ("Option D") (Options A, B, C and D are collectively referred to as the "Options"). The Options, which had a settlement date of November 23, 2001, were pledged as collateral on the Loan, described below.

72. In the purchase of the Options, Hudson actually paid a net amount to Deutsche Bank of at least $619,232.00, consisting of the difference between the premiums paid for the Options and the amount received by Hudson through the Loan (defined below), *minus* the amount earned by Hudson on the difference between the amount Hudson was paid based on the Note (defined below) and the amount Hudson paid to Deutsche for repayment of the Loan.

### 3. The Remaining Steps of the HOMER Strategy

73. On or about November 23, 2001, pursuant to the instructions and assistance of the Defendants and in accordance with the HOMER Strategy, Hudson borrowed $103,350,000.00 (the "Loan") from Deutsche Bank AG, and used the proceeds of the Loan to pay for the Options.

74. On or about November 27, 2001, Hudson transferred the Options and cash to the Trust. The Trust was formed under an irrevocable trust agreement, dated November 27, 2001 (the "Trust Agreement") with American National Bank as the Trustee (the "Trustee"). The Trust Agreement provided that Hudson retained a non-contingent remainder interest (the "Remainder Interest") in the Trust; Hudson made a gift of a three-year 0.0032% unitrust interest (the

24

"Unitrust Interest") to Ronald Comm (the "Unitrust Beneficiary"). No other interests in the Trust were held by any persons.

75. On or about December 7, 2001, Hudson sold the Remainder Interest to Whittaker Financial Partners ("Buyer") in return for an installment note obligation with a principal amount of $103,463,070 (the "Note"). The Note was due and payable on September 7, 2002. The Note was pledged as collateral on the Loan and the Options were released as collateral.

76. Starting on or about December 10, 2001, pursuant to the terms of the Trust Agreement, Hudson possessed the power to reacquire the Trust corpus by substituting other property of an equivalent value (the "Substitution Power").

77. On or about December 13, 2001 (the "Barrier Observation Date"), Options A and D expired pursuant to their terms.

78. On or about December 14, 2001, the Unitrust Interest was acquired by the Buyer from the Unitrust Beneficiary.

79. On or about December 14, 2001, the Trust terminated with the consent of all beneficial interest holders and Hudson as Settlor of the Trust, and the Trust assets, consisting of Options B and C and cash, were distributed to the Buyer as the holder of the Remainder Interest and Unitrust Interest.

80. On or about December 17, 2001, the Buyer liquidated the Trust and the Note was assumed by the Partners of the Buyer (the "Buyer Successors"), each of which was a corporation neither owned nor controlled by Hudson, and all assets of the Buyer, including Options B and C and the cash received upon termination of the Trust, were distributed to the Buyer Successors.

81. On or about December 19, 2001, Options B and C expired pursuant to their terms. On such date, Options B and C were held by the Buyer Successors.

25

82.     On or about December 21, 2001, the Note was paid by the Buyer Successors with a payment to Hudson in the amount of $103,545,553.83.

83.     On or about December 21, 2001, Hudson repaid the Loan by making a payment to Deutsche Bank in the amount of $103,514,785.83.

### E.     THE DEFENDANTS' REPEATED FAILURE TO GIVE FULL DISCLOSURE TO PLAINTIFFS

84.     As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, if not earlier, the Defendants knew or should have known, that the Defendants were illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Hudson, and that the purported losses arising from the Strategy were not properly allowable for Federal and State income tax purposes; however, the Defendants intentionally failed to inform Hudson of this and, in fact, advised them to the contrary.  Simply stated, the Defendants repeatedly deceived and knowingly misled Hudson and placed their greed over the best interest of their clients.

### F.     THE OPINION LETTER FOR HUDSON'S 2001 TAXES

85.     In early 2002, Jenkens sent Hudson an opinion letter regarding the propriety of the HOMER Strategy (the "Opinion Letter").  Hudson was still under the mistaken belief that the Opinion Letter set forth "independent" opinions of a law firm on the propriety of the HOMER Strategy.

86.     The Opinion Letter was authored and prepared based, in large part, on representations made by Defendants.  The Opinion Letter advised Hudson that, among other things:

(1)     The Trust should be classified as a trust for federal income tax purposes;

26

(2)     The Options should be treated as separate instruments for federal income tax purposes; Hudson's adjusted tax basis in each Option should be the premium Hudson paid for such Option;

(3)     The Trust should be treated as a grantor trust and, while Hudson owned the Remainder Interest, Hudson should be treated as the owner of the Trust for purposes of § 671 of the code;

(4)     The creation and initial funding of the Trust should not cause Hudson to recognize any taxable income; the adjusted tax basis of each Option should continue to equal the premium Hudson paid for such Option;

(5)     The sale of the Remainder Interest should be a taxable transaction to Hudson; the Trust should cease to be treated as a grantor trust upon the sale of the Remainder Interest; the adjusted tax basis of each Option should continue to equal the premium Hudson paid for such Option;

(6)     The beginning of the term of the Substitution Power should not be a taxable event; for the duration of the Substitution Power, the Trust should be treated as a grantor trust, and Hudson should be treated as the owner of the Trust for purposes of Code § 671;

(7)     The expiration of Options A and D on the Barrier Observation Date should cause Hudson to recognize a loss on such expiration;

(8)     Hudson should not recognize any taxable income on the Barrier Observation Date with respect to Options B and C;

(9)     The termination of the Trust and the related distribution of Trust assets to the Buyer, including Options B and C, should not cause Hudson to recognize any taxable income;

27

(10)    The expiration of Options B and C should not cause Hudson to recognize any taxable income on such expiration;

(11)    The step transaction, sham transaction, and economic substance doctrines should not apply to disallow the results of the HOMER Strategy; and

(12)    Code sections 165, 465, and 469 should not apply to the HOMER Strategy.

87.     Tellingly, the Jenkens opinion letters relating to other tax strategies, which were issued in 2000, stated that IRS Notice 1999-59 had no effect on Jenkens' opinion, while the Jenkens opinion letters issued in 2001 and 2002 (including Hudson's Opinion Letter) failed to mention IRS Notice 1999-59 at all. While Hudson's Opinion Letter did discuss IRS Notice 2000-44, it opined that Notice 2000-44 should have no substantive effect on the Homer Transaction. Based on information and belief, the Defendants were aware of the existence and effect of Notices 1999-59 and 2000-44, but intentionally failed to fully discuss, analyze, or apply the guidelines and standards set forth in these Notices on the HOMER Strategy.

88.     After receiving the Jenkens Opinion Letter, Hudson's representatives (Comm and Craig Hudson) participated in a conference call with Daugerdas and the Bank One Defendants to further discuss the validity of the tax treatment of the Strategy. Hudson's representatives specifically questioned Daugerdas and the Bank One Defendants about various articles that had been published regarding certain "tax shelters." Hudson's representatives were told unequivocally by Daugerdas and the Bank One Defendants that the Strategy Hudson participated in was different than the ones that were the subject of these articles and that there was absolutely nothing to worry about. From what Daugerdas and the Bank One Defendants told Hudson's representatives, the Strategy was a legitimate and legal tax-savings measure at the time Hudson participated in the transactions and it remained so. Hudson's representatives were given no

28

reason be concerned about the validity of the Strategy and Hudson followed the advice of Daugerdas, the Bank One Defendants, and the other Defendants.

## G. THE DEFENDANTS FAIL TO GIVE HUDSON FULL DISCLOSURE

89.     At no time prior to their implementation of the HOMER Strategy was Hudson informed that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the Defendants were therefore illegally promoting an unregistered tax shelter by marketing the Strategy to Hudson. The Defendants failed to inform Hudson of these facts and, in fact, advised them to the contrary.

90.     Between the time the Defendants advised, recommended, and pressured Hudson to enter into the HOMER Strategy and the time Hudson's tax returns were prepared, signed and filed, the Defendants never disclosed to Hudson the significance of IRS Notices 1999-59 and 2000-44. The Defendants failed to advise Hudson that the Strategy lacked a business purpose and economic substance and, in fact, advised Hudson to the contrary. Based on information and belief, Defendants intentionally failed to disclose this material information to Hudson.

91.     As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, and otherwise, the Defendants knew or should have known, before Jenkens issued the Opinion Letters, and before Hudson's tax returns were prepared in reliance on the Defendants' representations, that the IRS would contend that the purported losses arising from the Strategy were not properly allowable for Federal or State income tax purposes. However, the Defendants intentionally failed to inform Hudson of this and, indeed, informed her to the contrary.

92.     The Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the HOMER Strategy.

### 1.     The Defendants Fail to Advise Hudson to Enter the IRS Amnesty Program.

29

93.     In 2002, the IRS offered the "Tax Amnesty Program", a voluntary disclosure program for individuals and entities that participated in tax strategies like the HOMER Strategy. Under the Amnesty Program, taxpayers who disclosed their involvement in such strategies would avoid any liability for penalties for underpayment of taxes without conceding liability for back-taxes or interest.   Each Defendant had knowledge of the Amnesty Program and its applicability to Hudson.  The Defendants failed to inform Hudson of the Amnesty Program. Accordingly, to her detriment, Hudson did not participate in the Amnesty Program.

### 2.     Hudson Amends Her Returns

94.     In March 2004, Hudson was notified by Jenkens & Gilchrist that there was a high likelihood that the firm would be disclosing Hudson's participation in the HOMER Strategy to the IRS.  Jenkens & Gilchrist also warned Hudson that, even if Jenkens did not turn over her name, then Deutsche Bank and some of the other promoters of the HOMER Strategy were getting ready to disclose her identity as well.

95.     Upon being notified for the first time that there was a reason to be concerned about the HOMER Strategy, Hudson immediately amended both her 2001 Federal and 2001 Illinois tax returns on March 23, 2004.  Shortly thereafter, Hudson was formally placed under IRS audit for her 2001 Federal tax return.

### 3.     Hudson Learns of Fraud and Illegality

96.     After retaining new tax and legal advisors and at substantial expense, Hudson discovered for the first time that the Defendants had, among other things:

a)      Fraudulently induced her to participate in a bogus tax transaction that could succeed only if the IRS and state tax authorities neglected to audit her tax returns or otherwise failed to discover that she had engaged in the HOMER Strategy;

b)    Abused their fiduciary relationship with Hudson and committed professional malpractice by providing advice that they knew or should have known was wrong and directly contradicted by published IRS positions and case law;

c)    Exposed Hudson to substantial additional tax liability including interest and penalties due to the filing of an inaccurate return based on the HOMER Strategy;

d)    Caused Hudson to pay a substantial amount of money in fees to the Defendants for their false and fraudulent advice, to incur substantial additional costs and expenses for engaging in unnecessary options transactions, and for retaining new tax and legal advisors to investigate and rectify the situation; and

e)    Caused Hudson to forego other legitimate tax saving opportunities.

## H.   THE CONSPIRACY AMONG JENKENS AND THE DEFENDANTS

97.    On information and belief, the Defendants (along with Jenkens) conspired to devise and promote the HOMER Strategy for the purpose of receiving and splitting millions of dollars in fees (the "Defendants' Arrangement"). The receipt of those fees was the primary, if not sole, motive in the development and execution of the transaction. Further, the amount of fees earned by the Defendants was not tied to or reflective of the amount of time and effort they expended in providing tax or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on its tax returns. Indeed, Defendants devised the transaction and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the HOMER Strategy by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients were solicited. These "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

31

98.      Based on information and belief, before meeting with Hudson, the Defendants devised a game plan that included soliciting clients for the HOMER Strategy. The game plan also included a scheme wherein the Defendants identified potential clients and made the aggressive presentation. The Defendants would contact their clients and make one or more presentations to them. The Defendants would then set up additional meetings to allow the Deutsche Defendants and Jenkens to meet with the potential "targets". During these meetings, the Deutsche Defendants, along with Jenkens and the other Defendants, would each promote and market the HOMER Strategy as a completely legitimate tax-savings strategy. The Defendants would each assure the "target" that a major law firm, Jenkens, would prepare an "independent" opinion letter confirming the propriety and legality of the Strategy. The Defendants would tout the reputations of Jenkens, Deutsche Bank, Bank One and others as a means to assure the "target" that the Strategy was completely legal. The Defendants would not disclose the fact that Jenkens would be providing a legal opinion as to the propriety and legality of a tax transaction created, designed, and implemented in large part by Jenkens itself. This scheme was carried out with Hudson.

99.      The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants a significant pecuniary interest in the advice and professional services they would render.

I.      THE COST OF THE STRATEGIES

100.      The Plaintiffs lost a significant amount of money in carrying out the HOMER Strategy. For the HOMER Strategy and tax returns in connection therewith the Plaintiffs paid

fees (not including amounts paid to the Deutsche Defendants, such as the cost of the Options and the Loans) to the Defendants and others of at least $3,690,000.00.

101. The Plaintiffs also incurred and are continuing to incur significant legal, accounting, and other advisory fees in connection with rectifying the wrongs that have been perpetrated against them.

## J. IRS REACTION TO THE HOMER STRATEGY

102. In early 2005, after Hudson had amended her 2001 tax return and was placed under audit, the IRS notified Hudson of a "settlement" initiative being offered to individuals that participated in the HOMER Strategy under which such individuals would pay the IRS (a) all of the taxes avoided by use of these transactions, (b) all interest due, (c) a 10% penalty, and (d) a loss of 50% of the fees and other "out of pocket" costs deducted. If taxpayers did not accept this offer, then the IRS indicated they will be assessed all tax and interest, lose all deductions, and be assessed a 40% penalty. As a result of the extremely harsh result that would occur if Hudson did not settle with the IRS, Hudson reluctantly accepted the IRS' settlement offer and paid the IRS back-taxes, as well as $1,148,733.39 in interest and $978,449.30 in penalties.

103. Hudson has also been assessed $320,715.30 in interest and $363,062.70 in penalties by the State of Illinois for her 2001 Illinois tax return.

### IV.

### CAUSES OF ACTION

### COUNT I
(VIOLATION OF THE CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT)
(AGAINST ALL DEFENDANTS)

104. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-103 as if fully set forth herein.

33

105. In order to induce Plaintiffs to pay them substantial fees, the Defendants made numerous knowingly false affirmative representations and intentional omissions of material facts to Hudson, including but not limited to:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Hudson's finances to solicit Hudson for the HOMER Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3) Pressuring Hudson to engage in the HOMER Strategy by *inter alia* informing her that engaging in the HOMER Strategy was time-sensitive;

(4) Advising and recommending that Hudson engage in the HOMER Strategy;

(5) Charging and collecting unreasonable, excessive, and unethical fees;

(6) Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7) Failing to disclose that the Defendants were splitting and/or sharing fees;

(8) Failing to advise Hudson that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9) Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10) Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to Hudson;

34

(11) Failing to fully explain the details of the HOMER Strategy and assure that Hudson understood the HOMER Strategy before inducing her to enter into the Strategy;

(12) Representing to Hudson that the tax savings of the HOMER Strategy to Hudson would be significant and far outweigh the amount of fees and costs incurred by Hudson;

(13) Improperly using the position of Bank One as a multi-billion dollar, federally regulated financial institution in order to foster a relationship of trust and confidence;

(14) Advising Hudson that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

(15) Failing to advise Hudson that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16) Advising Hudson that the Jenkens' opinion letters could be relied upon to protect Hudson from incurring penalties if audited;

(17) Advising Hudson that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18) Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19) Failing to advise Hudson that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for

35

each of the many clients to which they rendered such opinion letters across the country;

(20)     Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Hudson;

(21)     Failing to disclose to Hudson that if she filed tax returns claiming losses based on the HOMER Strategy she could be liable for penalties and interest;

(22)     Advising Hudson that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23)     Representing and advising Hudson that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(24)     Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(25)     Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens and in Defendants' oral advice, instructions, and recommendations;

(26)     Failing to advise Hudson of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Hudson to engage in HOMER;

(27)     Recommending, advising, instructing, and assisting Hudson in carrying out each of the steps of the HOMER Strategy;

(28)     Recommending that Hudson purchase the Options;

(29)     Recommending, advising, instructing, and assisting Hudson in the Options;

(30)   Enticing, recommending, advising, assisting and directing Hudson to enter into a transaction that, unbeknownst to Hudson, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(31)   Advising Hudson that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

(32)   Failing to advise Hudson that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(33)   Advising Hudson that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(34)   Advising Hudson that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

(35)   Advising Hudson that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(36)   Failing to fully and properly inform and advise Hudson of IRS Notice 1999-59 and the *ACM* Case and their implications on the HOMER Strategy;

(37)   Failing to advise Hudson that IRS Notice 1999-59 and the *ACM* Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(38)   Advising Hudson that IRS Notice 1999-59 and the *ACM* Case did not apply to the

37

HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(39)   Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Hudson, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59 and the *ACM* Case;

(40)   Advising, instructing, and assisting in the preparation of filing of Hudson's tax returns, utilizing the losses generated by the HOMER Strategy;

(41)   Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

(42)   Advising Hudson that her tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(43)   Failing to fully and properly inform and advise Hudson of IRS Notice 2000-44 and its implications on the Strategy;

(44)   Advising Hudson that her HOMER transaction and/or all of the transaction's related information and data would be protected from an IRS summons or request and failing to disclose that similar and potentially compromising files would be held in the custody of the Defendants, would not be protected by the attorney-client privilege, and would be provided to the IRS;

(45)   Failing to fully explain the details of the HOMER Strategy marketed by the Defendants before inducing Hudson to enter into such scheme, including: 1) failing to identify the various parties involved in the scheme, 2) failing to reveal to Hudson the number of other participants in the scheme, and 3) failing to reveal the collective number of the strategies and/or transactions that the Defendants

designed, created, engineered, implemented, marketed, promoted and/or sold, which, in fact, compromised the viability of all of the HOMER Strategies sold, as the sheer volume of transactions caused a cascading effect upon the outcome of each individual transaction, invariably causing each one of them to be deemed potentially illegal and/or abusive;

(46) Advising Hudson that IRS Notice 2000-44 did not apply to the HOMER Strategy and/or impact the propriety of the HOMER Strategy;

(47) Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 1999-59 and the *ACM* Case;

(48) Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 2000-44;

(49) Failing to disclose existing published authority that purported losses for transactions such as the HOMER Strategy were improper and not allowable for Federal and/or State income tax purposes;

(50) Failing to recommend and advise Hudson to enroll in the Amnesty Program in order to prevent penalties and interest;

(51) Failing to ensure that the transactions into which Defendants advised Hudson to enter complied with the applicable State and Federal Rules and regulations;

(52) Failing to comply with their ethical obligations to Hudson;

(53) Violating their respective professional rules of conduct;

(54) Providing erroneous tax, legal, investment, and accounting opinions and advice;

(55) Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(56) Advising Hudson that the step transaction, sham transaction, and economic

substance doctrines would not apply to disallow the results of the HOMER Strategy;

(57)   Advising, recommending, instructing, and assisting Hudson in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(58)   Advising Hudson that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(59)   Informing Hudson that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(60)   Informing Hudson that the Opinion Letter would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61)   Advising, recommending, instructing, and assisting Hudson in engaging in a transaction which she was advised had business purpose and economic substance and made investment sense;

(62)   Failing to advise Hudson that the transactions had no business purpose and no economic substance and made no business sense;

(63)   Recommending, instructing, and advising Hudson to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(64)   Advising, recommending, instructing, and assisting Hudson in entering into transactions that, unbeknownst to Hudson, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and

40

violated the step transaction, sham transaction, and economic substance doctrines; and

(65) Failing to advise Hudson of other legitimate tax-savings and investments opportunities available to them.

106. Defendants, through the use of the mails and other means and in connection with the sale of securities, did knowingly, willfully or recklessly:

a. Make untrue statements of materials facts upon which Hudson relied and omitted to state material facts necessary to make the statements made not misleading, in light of the circumstances under which they were made;

b. Employ manipulative, deceptive and fraudulent devices, schemes and artifices to defraud Hudson; and

c. Engage in acts, practices, and a course of conduct which operated as a fraud and deceit upon Hudson, and which were unfair or deceptive.

107. The representations and omissions made by Defendants and Jenkens were false and misleading when made.

108. Defendants and Jenkens acted with the intent to deceive Hudson in order to obtain millions of dollars in fees, or with reckless disregard of the true facts.

109. Defendants' and Jenkens' material misrepresentations, omissions, and acts in furtherance of their scheme to defraud plaintiffs did deceive Hudson and induced her to pay substantial fees to defendants.

110. Hudson relied on Defendants' material misrepresentations and omissions of material fact in deciding to pay them substantial fees and other charges.

111. Plaintiffs have suffered injury and damages as a proximate result of the fraudulent actions of Defendants.

41

112. The material misrepresentations or omissions described above amounted to acts or practices that were unfair or deceptive, which deception Defendants intended Plaintiffs to rely upon, and which deception occurred in a course of conduct involving trade or commerce.

113. The above-described course of conduct by Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (1993).

114. As a result of such violations, Plaintiffs have suffered injury and damages.

## COUNT II
### (BREACH OF CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING) (AGAINST THE DEUTSCHE DEFENDANTS ONLY)

115. Plaintiffs reallege each and every allegation set forth in Paragraphs 1-103 and incorporate them by reference herein as if fully set forth.

116. Plaintiffs entered into agreements with the Deutsche Defendants with respect to the HOMER Contracts. As a result, the Deutsche Defendants owed the Plaintiffs a duty of good faith and fair dealing.

117. The Deutsche Defendants breached their agreements with Plaintiffs (including but not limited to, the HOMER Contracts), and their duty of good faith and fair dealing, by, among other things,

- Failing to disclose the true relationship between the Deutsche Defendants, Jenkens, and the other Defendants with respect to the HOMER Strategy;

- Affirmatively giving improper and incorrect tax advice in connection with the tax strategy (as fully discussed previously in the Complaint); and

- Failing to disclose the existence and significance of the IRS Notices (as discussed previously in this Complaint).

118. As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants and others substantial fees, (2) they unnecessarily purchased the

HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

119.  By reason of the foregoing acts and conduct, Plaintiffs are entitled to recover from the Deutsche Defendants all actual damages sustained by them as a result of these Defendants' acts as alleged above, to be proven at trial, plus consequential damages, punitive damages in accordance with the evidence, interest, costs, and a reasonable attorneys' fee.

**COUNT III**
**(BREACH OF FIDUCIARY DUTY)**
**(AGAINST ALL DEFENDANTS EXCEPT WHITE & CASE)**

120.  Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-103 as if fully set forth herein.

121.  The Defendants, as Hudson's tax and investment advisors, were Hudson's fiduciaries, and thus owed Hudson the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.

122.  These Defendants breached their fiduciary duties to Hudson by advising Hudson to engage in the HOMER Strategy and to sign and file the tax returns in reliance on the Defendants' advice, representations, recommendations, instructions, and opinions, which the Defendants knew or should have known to be improper and illegal, for the purpose of generating huge fees for the Defendants.

123.  The Defendants breached their fiduciary duties to Hudson by, among others, the following acts and/or omissions:

(1)  Taking advantage of a relationship of trust and confidence and using their knowledge of Hudson's finances to solicit Hudson for the HOMER Strategy;

43

(2)     Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3)     Pressuring Hudson to engage in the HOMER Strategy by *inter alia* informing her that engaging in the HOMER Strategy was time-sensitive;

(4)     Advising and recommending that Hudson engage in the HOMER Strategy;

(5)     Charging and collecting unreasonable, excessive, and unethical fees;

(6)     Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7)     Failing to disclose that the Defendants were splitting and/or sharing fees;

(8)     Failing to advise Hudson that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9)     Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10)    Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to Hudson;

(11)    Failing to fully explain the details of the HOMER Strategy and assure that Hudson understood the HOMER Strategy before inducing her to enter into the Strategy;

44

(12)   Representing to Hudson that the tax savings of the HOMER Strategy to Hudson would be significant and far outweigh the amount of fees and costs incurred by Hudson;

(13)   Improperly using the position of Bank One as a multi-billion dollar, federally regulated financial institution in order to foster a relationship of trust and confidence;

(14)   Advising Hudson that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

(15)   Failing to advise Hudson that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16)   Advising Hudson that the Jenkens' opinion letters could be relied upon to protect Hudson from incurring penalties if audited;

(17)   Advising Hudson that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18)   Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19)   Failing to advise Hudson that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20)   Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Hudson;

(21)   Failing to disclose to Hudson that if she filed tax returns claiming losses based on the HOMER Strategy she could be liable for penalties and interest;

(22)   Advising Hudson that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23)   Representing and advising Hudson that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(24)   Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(25)   Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens and in Defendants' oral advice, instructions, and recommendations;

(26)   Failing to advise Hudson of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Hudson to engage in HOMER;

(27)   Recommending, advising, instructing, and assisting Hudson in carrying out each of the steps of the HOMER Strategy;

(28)   Recommending that Hudson purchase the Options;

(29)   Recommending, advising, instructing, and assisting Hudson in the Options;

(30)   Enticing, recommending, advising, assisting and directing Hudson to enter into a transaction that, unbeknownst to Hudson, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(31)   Advising Hudson that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

(32) Failing to advise Hudson that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(33) Advising Hudson that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(34) Advising Hudson that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

(35) Advising Hudson that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(36) Failing to fully and properly inform and advise Hudson of IRS Notice 1999-59 and the *ACM* Case and their implications on the HOMER Strategy;

(37) Failing to advise Hudson that IRS Notice 1999-59 and the *ACM* Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(38) Advising Hudson that IRS Notice 1999-59 and the *ACM* Case did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(39) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Hudson, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59 and the *ACM* Case;

(40) Advising, instructing, and assisting in the preparation of filing of Hudson's tax

returns, utilizing the losses generated by the HOMER Strategy;

(41)   Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

(42)   Advising Hudson that her tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(43)   Failing to fully and properly inform and advise Hudson of IRS Notice 2000-44 and its implications on the Strategy;

(44)   Advising Hudson that her HOMER transaction and/or all of the transaction's related information and data would be protected from an IRS summons or request and failing to disclose that similar and potentially compromising files would be held in the custody of the Defendants, would not be protected by the attorney-client privilege, and would be provided to the IRS;

(45)   Failing to fully explain the details of the HOMER Strategy marketed by the Defendants before inducing Hudson to enter into such scheme, including: 1) failing to identify the various parties involved in the scheme, 2) failing to reveal to Hudson the number of other participants in the scheme, and 3) failing to reveal the collective number of the strategies and/or transactions that the Defendants designed, created, engineered, implemented, marketed, promoted and/or sold, which, in fact, compromised the viability of all of the HOMER Strategies sold, as the sheer volume of transactions caused a cascading effect upon the outcome of each individual transaction, invariably causing each one of them to be deemed potentially illegal and/or abusive;

(46)   Advising Hudson that IRS Notice 2000-44 did not apply to the HOMER Strategy

and/or impact the propriety of the HOMER Strategy;

(47) Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 1999-59 and the *ACM* Case;

(48) Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 2000-44;

(49) Failing to disclose existing published authority that purported losses for transactions such as the HOMER Strategy were improper and not allowable for Federal and/or State income tax purposes;

(50) Failing to recommend and advise Hudson to enroll in the Amnesty Program in order to prevent penalties and interest;

(51) Failing to ensure that the transactions into which Defendants advised Hudson to enter complied with the applicable State and Federal Rules and regulations;

(52) Failing to comply with their ethical obligations to Hudson;

(53) Violating their respective professional rules of conduct;

(54) Providing erroneous tax, legal, investment, and accounting opinions and advice;

(55) Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(56) Advising Hudson that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the HOMER Strategy;

(57) Advising, recommending, instructing, and assisting Hudson in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

49

(58)   Advising Hudson that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(59)   Informing Hudson that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(60)   Informing Hudson that the Opinion Letter would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61)   Advising, recommending, instructing, and assisting Hudson in engaging in a transaction which she was advised had business purpose and economic substance and made investment sense;

(62)   Failing to advise Hudson that the transactions had no business purpose and no economic substance and made no business sense;

(63)   Recommending, instructing, and advising Hudson to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(64)   Advising, recommending, instructing, and assisting Hudson in entering into transactions that, unbeknownst to Hudson, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines; and

(65)   Failing to advise Hudson of other legitimate tax-savings and investments opportunities available to them.

124.   As a result of Defendants' conduct set forth herein, Hudson has suffered injury in that (1) she paid Defendants and others substantial fees, (2) she unnecessarily purchased the

HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) she has incurred tax penalties and interest and disallowance of certain deductions, (4) she lost the opportunity to avail herself of other legitimate tax-savings strategies, and (5) she has incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

125.    As a proximate cause of the foregoing, Hudson has been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

**COUNT IV**
**(FRAUD)**
**(AGAINST ALL DEFENDANTS)**

126.    Plaintiffs repeat and reallege each and every prior allegation of Paragraphs 1-103 as if fully set forth herein.

127.    In order to induce the Plaintiffs to pay them substantial fees, the Defendants made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs, including but not limited to:

(1)    Taking advantage of a relationship of trust and confidence and using their knowledge of Hudson's finances to solicit Hudson for the HOMER Strategy;

(2)    Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3)    Pressuring Hudson to engage in the HOMER Strategy by *inter alia* informing her that engaging in the HOMER Strategy was time-sensitive;

(4)    Advising and recommending that Hudson engage in the HOMER Strategy;

(5)    Charging and collecting unreasonable, excessive, and unethical fees;

(6)    Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7)    Failing to disclose that the Defendants were splitting and/or sharing fees;

(8)    Failing to advise Hudson that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9)    Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10)    Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to Hudson;

(11)    Failing to fully explain the details of the HOMER Strategy and assure that Hudson understood the HOMER Strategy before inducing her to enter into the Strategy;

(12)    Representing to Hudson that the tax savings of the HOMER Strategy to Hudson would be significant and far outweigh the amount of fees and costs incurred by Hudson;

(13)    Improperly using the position of Bank One as a multi-billion dollar, federally regulated financial institution in order to foster a relationship of trust and confidence;

(14)    Advising Hudson that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

(15) Failing to advise Hudson that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16) Advising Hudson that the Jenkens' opinion letters could be relied upon to protect Hudson from incurring penalties if audited;

(17) Advising Hudson that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18) Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19) Failing to advise Hudson that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20) Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Hudson;

(21) Failing to disclose to Hudson that if she filed tax returns claiming losses based on the HOMER Strategy she could be liable for penalties and interest;

(22) Advising Hudson that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23) Representing and advising Hudson that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(24)  Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(25)  Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens and in Defendants' oral advice, instructions, and recommendations;

(26)  Failing to advise Hudson of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Hudson to engage in HOMER;

(27)  Recommending, advising, instructing, and assisting Hudson in carrying out each of the steps of the HOMER Strategy;

(28)  Recommending that Hudson purchase the Options;

(29)  Recommending, advising, instructing, and assisting Hudson in the Options;

(30)  Enticing, recommending, advising, assisting and directing Hudson to enter into a transaction that, unbeknownst to Hudson, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(31)  Advising Hudson that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

(32)  Failing to advise Hudson that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(33)  Advising Hudson that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(34)  Advising Hudson that the design of the HOMER Strategy and the Options were

unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

(35) Advising Hudson that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(36) Failing to fully and properly inform and advise Hudson of IRS Notice 1999-59 and the *ACM* Case and their implications on the HOMER Strategy;

(37) Failing to advise Hudson that IRS Notice 1999-59 and the *ACM* Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(38) Advising Hudson that IRS Notice 1999-59 and the *ACM* Case did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(39) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Hudson, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59 and the *ACM* Case;

(40) Advising, instructing, and assisting in the preparation of filing of Hudson's tax returns, utilizing the losses generated by the HOMER Strategy;

(41) Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

(42) Advising Hudson that her tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(43) Failing to fully and properly inform and advise Hudson of IRS Notice 2000-44

55

and its implications on the Strategy;

(44)    Advising Hudson that her HOMER transaction and/or all of the transaction's

        related information and data would be protected from an IRS summons or request

        and failing to disclose that similar and potentially compromising files would be

        held in the custody of the Defendants, would not be protected by the attorney-

        client privilege, and would be provided to the IRS;

(45)    Failing to fully explain the details of the HOMER Strategy marketed by the

        Defendants before inducing Hudson to enter into such scheme, including: 1)

        failing to identify the various parties involved in the scheme, 2) failing to reveal

        to Hudson the number of other participants in the scheme, and 3) failing to reveal

        the collective number of the strategies and/or transactions that the Defendants

        designed, created, engineered, implemented, marketed, promoted and/or sold,

        which, in fact, compromised the viability of all of the HOMER Strategies sold, as

        the sheer volume of transactions caused a cascading effect upon the outcome of

        each individual transaction, invariably causing each one of them to be deemed

        potentially illegal and/or abusive;

(46)    Advising Hudson that IRS Notice 2000-44 did not apply to the HOMER Strategy

        and/or impact the propriety of the HOMER Strategy;

(47)    Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS

        Notice 1999-59 and the *ACM* Case;

(48)    Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS

        Notice 2000-44;

(49)    Failing to disclose existing published authority that purported losses for

        transactions such as the HOMER Strategy were improper and not allowable for

Federal and/or State income tax purposes;

(50)    Failing to recommend and advise Hudson to enroll in the Amnesty Program in order to prevent penalties and interest;

(51)    Failing to ensure that the transactions into which Defendants advised Hudson to enter complied with the applicable State and Federal Rules and regulations;

(52)    Failing to comply with their ethical obligations to Hudson;

(53)    Violating their respective professional rules of conduct;

(54)    Providing erroneous tax, legal, investment, and accounting opinions and advice;

(55)    Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(56)    Advising Hudson that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the HOMER Strategy;

(57)    Advising, recommending, instructing, and assisting Hudson in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(58)    Advising Hudson that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(59)    Informing Hudson that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(60)    Informing Hudson that the Opinion Letter would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61)  Advising, recommending, instructing, and assisting Hudson in engaging in a transaction which she was advised had business purpose and economic substance and made investment sense;

(62)  Failing to advise Hudson that the transactions had no business purpose and no economic substance and made no business sense;

(63)  Recommending, instructing, and advising Hudson to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(64)  Advising, recommending, instructing, and assisting Hudson in entering into transactions that, unbeknownst to Hudson, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines; and

(65)  Failing to advise Hudson of other legitimate tax-savings and investments opportunities available to them.

128.  The above intentional omissions of material fact and/or affirmative representations made by each Defendant were false when made and the Defendants knew these representations to be false when made with the intention that Plaintiffs rely upon them in participating in the HOMER Strategy and pay them substantial fees. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Defendants, also with the intent to induce Plaintiffs to participate in the Strategy and pay them substantial fees.

129.  In reasonable reliance on the Defendants' false affirmative representations and intentional omissions of material facts regarding the HOMER Strategy, Plaintiffs paid

58

substantial fees to Defendants for tax and investment advice, paid additional amounts to execute the Strategy, they unnecessarily purchased the HOMER Contracts and took out the HOMER Loans to effectuate the HOMER Strategy, did not disclose the transaction on Hudson's federal tax returns as a tax shelter, filed federal and state tax returns that reflected improper deductions for losses resulting from the HOMER Strategy, and did not participate in the IRS Amnesty Program.

130.    But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs would never have hired Defendants for advice on the HOMER Strategy, engaged in the HOMER Strategy, claimed the purportedly resulting losses on their income tax returns, filed and signed their tax returns in reliance on the Defendants' advice and/or not disclosed the transaction on their federal tax returns as a tax shelter.   After discovering the Defendants' fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

131.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants and others substantial fees, (2) they unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

132.    As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

**COUNT V**
**(NEGLIGENT MISREPRESENTATION)**
**(AGAINST ALL DEFENDANTS)**

(6)     Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7)     Failing to disclose that the Defendants were splitting and/or sharing fees;

(8)     Failing to advise Hudson that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9)     Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10)    Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to Hudson;

(11)    Failing to fully explain the details of the HOMER Strategy and assure that Hudson understood the HOMER Strategy before inducing her to enter into the Strategy;

(12)    Representing to Hudson that the tax savings of the HOMER Strategy to Hudson would be significant and far outweigh the amount of fees and costs incurred by Hudson;

(13)    Improperly using the position of Bank One as a multi-billion dollar, federally regulated financial institution in order to foster a relationship of trust and confidence;

61

(14)    Advising Hudson that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

(15)    Failing to advise Hudson that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16)    Advising Hudson that the Jenkens' opinion letters could be relied upon to protect Hudson from incurring penalties if audited;

(17)    Advising Hudson that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18)    Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19)    Failing to advise Hudson that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20)    Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Hudson;

(21)    Failing to disclose to Hudson that if she filed tax returns claiming losses based on the HOMER Strategy she could be liable for penalties and interest;

(22)    Advising Hudson that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23) Representing and advising Hudson that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(24) Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(25) Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens and in Defendants' oral advice, instructions, and recommendations;

(26) Failing to advise Hudson of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Hudson to engage in HOMER;

(27) Recommending, advising, instructing, and assisting Hudson in carrying out each of the steps of the HOMER Strategy;

(28) Recommending that Hudson purchase the Options;

(29) Recommending, advising, instructing, and assisting Hudson in the Options;

(30) Enticing, recommending, advising, assisting and directing Hudson to enter into a transaction that, unbeknownst to Hudson, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(31) Advising Hudson that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

(32) Failing to advise Hudson that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(33) Advising Hudson that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(34) Advising Hudson that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

(35) Advising Hudson that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(36) Failing to fully and properly inform and advise Hudson of IRS Notice 1999-59 and the *ACM* Case and their implications on the HOMER Strategy;

(37) Failing to advise Hudson that IRS Notice 1999-59 and the *ACM* Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(38) Advising Hudson that IRS Notice 1999-59 and the *ACM* Case did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(39) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Hudson, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59 and the *ACM* Case;

(40) Advising, instructing, and assisting in the preparation of filing of Hudson's tax returns, utilizing the losses generated by the HOMER Strategy;

(41) Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

(42)    Advising Hudson that her tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(43)    Failing to fully and properly inform and advise Hudson of IRS Notice 2000-44 and its implications on the Strategy;

(44)    Advising Hudson that her HOMER transaction and/or all of the transaction's related information and data would be protected from an IRS summons or request and failing to disclose that similar and potentially compromising files would be held in the custody of the Defendants, would not be protected by the attorney-client privilege, and would be provided to the IRS;

(45)    Failing to fully explain the details of the HOMER Strategy marketed by the Defendants before inducing Hudson to enter into such scheme, including: 1) failing to identify the various parties involved in the scheme, 2) failing to reveal to Hudson the number of other participants in the scheme, and 3) failing to reveal the collective number of the strategies and/or transactions that the Defendants designed, created, engineered, implemented, marketed, promoted and/or sold, which, in fact, compromised the viability of all of the HOMER Strategies sold, as the sheer volume of transactions caused a cascading effect upon the outcome of each individual transaction, invariably causing each one of them to be deemed potentially illegal and/or abusive;

(46)    Advising Hudson that IRS Notice 2000-44 did not apply to the HOMER Strategy and/or impact the propriety of the HOMER Strategy;

(47)    Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 1999-59 and the *ACM* Case;

(48)  Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 2000-44;

(49)  Failing to disclose existing published authority that purported losses for transactions such as the HOMER Strategy were improper and not allowable for Federal and/or State income tax purposes;

(50)  Failing to recommend and advise Hudson to enroll in the Amnesty Program in order to prevent penalties and interest;

(51)  Failing to ensure that the transactions into which Defendants advised Hudson to enter complied with the applicable State and Federal Rules and regulations;

(52)  Failing to comply with their ethical obligations to Hudson;

(53)  Violating their respective professional rules of conduct;

(54)  Providing erroneous tax, legal, investment, and accounting opinions and advice;

(55)  Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(56)  Advising Hudson that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the HOMER Strategy;

(57)  Advising, recommending, instructing, and assisting Hudson in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(58)  Advising Hudson that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(59)  Informing Hudson that the HOMER Strategy was not a "sham transaction" that

would be ignored or disallowed for tax purposes;

(60) Informing Hudson that the Opinion Letter would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61) Advising, recommending, instructing, and assisting Hudson in engaging in a transaction which she was advised had business purpose and economic substance and made investment sense;

(62) Failing to advise Hudson that the transactions had no business purpose and no economic substance and made no business sense;

(63) Recommending, instructing, and advising Hudson to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(64) Advising, recommending, instructing, and assisting Hudson in entering into transactions that, unbeknownst to Hudson, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines; and

(65) Failing to advise Hudson of other legitimate tax-savings and investments opportunities available to them.

137. These Defendants either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be false.

138. In reasonable reliance on the Defendants' affirmative representations and negligent omissions of material facts regarding the HOMER Strategy, Hudson paid substantial fees to Defendants for tax and investment advice, paid additional fees to execute the Strategy,

unnecessarily purchased the HOMER Contracts to effectuate the HOMER Strategy, did not enter the Amnesty Program, and filed federal and state tax returns that reflected deductions for losses resulting from the Strategy.

139.    But for the Defendants' negligent misrepresentations and material omissions described above, Hudson would never have hired and paid substantial fees to Defendants for tax and investment advice, paid additional amounts to execute the Strategy, purchased the HOMER Contracts and taken out the HOMER Loans to effectuate the HOMER Strategy, not disclosed the transaction on their federal tax returns as a tax shelter, filed federal and state tax returns that reflected improper deductions for losses resulting from the HOMER Strategy, and failed to take advantage of the IRS Amnesty Program.

140.    After discovering the Defendants' negligent misrepresentations, Hudson incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

141.    As a result of Defendants' conduct set forth herein, Hudson has suffered injury in that (1) she paid Defendants and others substantial fees, (2) she unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) she has incurred tax penalties and interest and disallowance of certain deductions, (4) she lost the opportunity to avail herself of other legitimate tax-savings strategies, and (5) she has incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

142.    As a proximate cause of the foregoing, Hudson has been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

**COUNT VI**
**(NEGLIGENCE)**
**(AGAINST ALL DEFENDANTS)**

143. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-103 as if fully set forth herein.

144. As lawyers, tax advisors, and investment advisors for Hudson (or on whom Hudson was justifiably relying, directly or indirectly), the Defendants owed Hudson duties of care, loyalty and honesty, a duty to comply with the applicable standards of care, and a duty to comply with the applicable provisions of their codes of professional responsibility.

145. These Defendants also had a duty to Hudson to meet the applicable standard of care for accountants and tax advisors. These Defendants failed to meet those applicable standards of care. The Defendants' negligence rises to the level of gross negligence and malice. The Defendants' failure to meet the standard of care caused damages to Hudson as set forth elsewhere in this Complaint.

146. As to the Defendants with whom Hudson had no contractual relationship, these Defendants (including White and Case) were aware that the transaction and Options that were designed, marketed and promoted by the Defendants (including the Deutsche Defendants) would be used for the purpose of the HOMER Strategy. These Defendants also knew that Hudson would rely on the HOMER Strategy, and the Defendants were linked to the Hudson by their conduct.

147. The Defendants breached the applicable standard of care in, among others, the following manner:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Hudson's finances to solicit Hudson for the HOMER Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3) Pressuring Hudson to engage in the HOMER Strategy by *inter alia* informing her

69

that engaging in the HOMER Strategy was time-sensitive;

(4)     Advising and recommending that Hudson engage in the HOMER Strategy;

(5)     Charging and collecting unreasonable, excessive, and unethical fees;

(6)     Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7)     Failing to disclose that the Defendants were splitting and/or sharing fees;

(8)     Failing to advise Hudson that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9)     Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10)    Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to Hudson;

(11)    Failing to fully explain the details of the HOMER Strategy and assure that Hudson understood the HOMER Strategy before inducing her to enter into the Strategy;

(12)    Representing to Hudson that the tax savings of the HOMER Strategy to Hudson would be significant and far outweigh the amount of fees and costs incurred by Hudson;

70

(13)   Improperly using the position of Bank One as a multi-billion dollar, federally regulated financial institution in order to foster a relationship of trust and confidence;

(14)   Advising Hudson that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

(15)   Failing to advise Hudson that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16)   Advising Hudson that the Jenkens' opinion letters could be relied upon to protect Hudson from incurring penalties if audited;

(17)   Advising Hudson that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18)   Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19)   Failing to advise Hudson that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20)   Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Hudson;

(21)   Failing to disclose to Hudson that if she filed tax returns claiming losses based on the HOMER Strategy she could be liable for penalties and interest;

71

(22) Advising Hudson that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23) Representing and advising Hudson that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(24) Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(25) Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens and in Defendants' oral advice, instructions, and recommendations;

(26) Failing to advise Hudson of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Hudson to engage in HOMER;

(27) Recommending, advising, instructing, and assisting Hudson in carrying out each of the steps of the HOMER Strategy;

(28) Recommending that Hudson purchase the Options;

(29) Recommending, advising, instructing, and assisting Hudson in the Options;

(30) Enticing, recommending, advising, assisting and directing Hudson to enter into a transaction that, unbeknownst to Hudson, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(31) Advising Hudson that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

72

(32)     Failing to advise Hudson that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(33)     Advising Hudson that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(34)     Advising Hudson that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

(35)     Advising Hudson that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(36)     Failing to fully and properly inform and advise Hudson of IRS Notice 1999-59 and the *ACM* Case and their implications on the HOMER Strategy;

(37)     Failing to advise Hudson that IRS Notice 1999-59 and the *ACM* Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(38)     Advising Hudson that IRS Notice 1999-59 and the *ACM* Case did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(39)     Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Hudson, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59 and the *ACM* Case;

(40)   Advising, instructing, and assisting in the preparation of filing of Hudson's tax

returns, utilizing the losses generated by the HOMER Strategy;

(41)   Advising, confirming, and/or ratifying that the Jenkens' opinion letters were

accurate and correct;

(42)   Advising Hudson that her tax returns, which utilized the losses generated by the

HOMER Strategy, were prepared in accordance with professional standards and

pursuant to IRS guidelines and established legal authorities;

(43)   Failing to fully and properly inform and advise Hudson of IRS Notice 2000-44

and its implications on the Strategy;

(44)   Advising Hudson that her HOMER transaction and/or all of the transaction's

related information and data would be protected from an IRS summons or request

and failing to disclose that similar and potentially compromising files would be

held in the custody of the Defendants, would not be protected by the attorney-

client privilege, and would be provided to the IRS;

(45)   Failing to fully explain the details of the HOMER Strategy marketed by the

Defendants before inducing Hudson to enter into such scheme, including: 1)

failing to identify the various parties involved in the scheme, 2) failing to reveal

to Hudson the number of other participants in the scheme, and 3) failing to reveal

the collective number of the strategies and/or transactions that the Defendants

designed, created, engineered, implemented, marketed, promoted and/or sold,

which, in fact, compromised the viability of all of the HOMER Strategies sold, as

the sheer volume of transactions caused a cascading effect upon the outcome of

each individual transaction, invariably causing each one of them to be deemed potentially illegal and/or abusive;

(46)  Advising Hudson that IRS Notice 2000-44 did not apply to the HOMER Strategy and/or impact the propriety of the HOMER Strategy;

(47)  Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 1999-59 and the *ACM* Case;

(48)  Advising Hudson that the HOMER Strategy was valid and proper in spite of IRS Notice 2000-44;

(49)  Failing to disclose existing published authority that purported losses for transactions such as the HOMER Strategy were improper and not allowable for Federal and/or State income tax purposes;

(50)  Failing to recommend and advise Hudson to enroll in the Amnesty Program in order to prevent penalties and interest;

(51)  Failing to ensure that the transactions into which Defendants advised Hudson to enter complied with the applicable State and Federal Rules and regulations;

(52)  Failing to comply with their ethical obligations to Hudson;

(53)  Violating their respective professional rules of conduct;

(54)  Providing erroneous tax, legal, investment, and accounting opinions and advice;

(55)  Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(56)  Advising Hudson that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the HOMER Strategy;

75

(57) Advising, recommending, instructing, and assisting Hudson in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(58) Advising Hudson that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(59) Informing Hudson that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(60) Informing Hudson that the Opinion Letter would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61) Advising, recommending, instructing, and assisting Hudson in engaging in a transaction which she was advised had business purpose and economic substance and made investment sense;

(62) Failing to advise Hudson that the transactions had no business purpose and no economic substance and made no business sense;

(63) Recommending, instructing, and advising Hudson to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(64) Advising, recommending, instructing, and assisting Hudson in entering into transactions that, unbeknownst to Hudson, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines;

and

(65)    Failing to advise Hudson of other legitimate tax-savings and investments opportunities available to them.

148.    These Defendants' negligence rises to the level of gross negligence. These Defendants' negligence proximately caused Hudson's damages.

149.    In reasonable reliance on the Defendants' negligent and grossly negligent acts identified above, Hudson paid substantial fees to Defendants and others for legal, tax and investment advice, paid additional fees to execute the Strategy, unnecessarily purchased the HOMER Contracts to effectuate the HOMER Strategy, did not enter the Amnesty Program, and filed federal and state tax returns that reflected deductions for losses resulting from the Strategy.

150.    But for the Defendants' negligence and gross negligence described above, Hudson would never have hired and paid substantial fees to Defendants for tax and investment advice, paid additional amounts to execute the Strategy, purchased the HOMER Contracts and taken out the HOMER Loans to effectuate the HOMER Strategy, not disclosed the transaction on their federal tax returns as a tax shelter, filed federal and state tax returns that reflected improper deductions for losses resulting from the HOMER Strategy, and failed to participate in the IRS Amnesty Program.

151.    After discovering the Defendants' negligence, Hudson incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

152.    As a result of Defendants' conduct set forth herein, Hudson has suffered injury in that (1) she paid Defendants and others substantial fees, (2) she unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) she has incurred tax penalties and interest and disallowance of certain deductions, (4) she lost the

opportunity to avail herself of other legitimate tax-savings strategies, and (5) she has incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

153.    As a proximate cause of the foregoing, Hudson has been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

**COUNT VII**
**(BREACH OF CONTRACT)**
**(AGAINST ALL DEFENDANTS EXCEPT THE DEUTSCHE DEFENDANTS AND WHITE & CASE)**

154.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-103 as if fully set forth herein.

155.    Plaintiffs entered into oral and/or written contracts with these Defendants to provide Plaintiffs with professionally competent investment and/or tax advice and services. In connection therewith, these Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct.

156.    Plaintiffs fully performed their obligations to these Defendants under these contracts and thus did not contribute to the Defendants' breaches in any way.

157.    These Defendants ignored their obligations and instead provided Plaintiffs with advice, opinions, recommendations, representations and instructions that these Defendants either knew or reasonably should have known to be wrong. In addition, these Defendants breached their oral and/or written contracts with Plaintiffs by the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise Plaintiffs of the omissions set forth above. Accordingly, these Defendants breached their contracts with Plaintiffs.

78

158.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants and others substantial fees, (2) they unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

159.    As a proximate cause thereof, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded all actual, consequential, and incidental damages in accordance with the evidence, plus attorneys' fee and costs.

### COUNT VIII
### (DECLARATORY JUDGMENT)
### (AGAINST ALL DEFENDANTS)

160.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-103 as if fully set forth herein.

161.    In early 2005, the IRS notified Hudson of a "settlement" initiative being offered to individuals that participated in the HOMER Strategy under which such individuals would pay the IRS (a) all of the taxes avoided by use of these transactions, (b) all interest due, (c) a 10% penalty, and (d) a loss of 50% of the fees and other "out of pocket" costs deducted. If taxpayers do not accept this offer, then the IRS has indicated they will be assessed all tax and interest, lose all deductions, and be assessed a 40% penalty. As a result of the extremely harsh result that would occur if Hudson did not settle with the IRS, Hudson reluctantly accepted the IRS' settlement offer and paid the IRS back-taxes, interest, and penalties.

162.    Hudson has also been assessed a substantial penalty and interest by the State of Illinois for her participation in the HOMER Strategy.

79

163. Defendants are legally responsible for: (1) interest and/or penalties assessed by the IRS or state taxing authority, as well as the disallowance of other certain deductions, against Hudson; (2) professional fees and costs incurred by Hudson in connection with the Federal and state investigations and audits and rectifying the situation; (3) significant fees and expenses (including the cost of the HOMER Contracts and the Loan Fees) incurred by Hudson in connection with the HOMER Strategy and on account of the claims asserted herein; and (4) tax savings and investment opportunities lost.

164. Pursuant to Section 2-701 of the Code of Civil Procedure [735 ILCS 2-701], Hudson is entitled to a declaration that Defendants are liable to Hudson for such penalties, interest, loss of certain other deductions, costs, professional fees, expenses and damages. There exists an actual, justiciable controversy between the parties as Defendants have denied such liability.

**COUNT IX**
**(CIVIL CONSPIRACY)**
**(AGAINST ALL DEFENDANTS)**

165. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1-103 as if fully set forth herein.

166. As described more fully above, the Defendants knowingly acted in concert to market and implement the fraudulent and illegal HOMER Strategy. In doing so, the Defendants acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint, when they in fact lacked those features (which were necessary for a successful tax strategy).

167. The Defendants acted in the respective roles as described above according to a

predetermined and commonly understood and accepted plan of action (*i.e.*, the Defendants' Arrangement), all for the purposes of obtaining professional fees from consumers, including the Plaintiffs.

168.　The acts of the Defendants were contrary to numerous provisions of law, as stated above.

169.　There was a meeting of the minds between and among the Defendants, and other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause Plaintiffs' damages as previously set forth herein.

170.　As a result of the Defendants' conduct set forth herein, the Plaintiffs have suffered injury to their business and property in that Plaintiffs have paid Defendants more than one million dollars in fees and have incurred actual damages and losses in an amount to be proven at trial; have incurred tax penalties and interest and disallowance of other certain deductions; have incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; and have foregone legitimate tax savings and investment opportunities.

171.　Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

### IX.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

A.　As to Count I (Violation of the Consumer Fraud and Deceptive Business Practices Act): A judgment in favor of the Plaintiffs against each Defendant jointly and

severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees and costs, rescission of the HOMER Contracts and the Loans and return of all monies paid by them in connection therewith;

      B.     As to Count II (Breach of Contract/Breach of the Duty of Good Faith and Fair Dealing): A judgment in favor of Plaintiffs against the Deutsche Defendants jointly and severally, for actual, consequential, and incidental damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

      C.     As to Count III (Breach of Fiduciary Duty): A judgment in favor of Hudson against each Defendant (except White & Case) jointly and severally, for actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs

      E.     As to Count IV (Fraud): A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs, rescission of the HOMER Contracts and the Loans and return of all monies paid by them in connection therewith;

      F.     As to Count V (Negligent Misrepresentation): A judgment in favor of Hudson against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

      G.     As to Count VI (Negligence): A judgment in favor of Hudson against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

      H.     As to Count VII (Breach of Contract): A judgment in favor of the Plaintiffs against each Defendant (except the Deutsche Defendants and White & Case) jointly and

severally, actual damages in an amount to be proven at trial in accordance with the evidence, attorneys' fees, consequential damages, incidental damages, interest, and costs;

I.    As to Count VIII (Declaratory Judgment): A declaration in favor of Hudson for all relief prayed for herein and that Defendants are liable to Hudson for any and all interest and penalties assessed against them by the IRS and/or State tax authorities resulting from Hudson's participation in the HOMER Strategy, for all professional fees, costs, and expenses incurred by Hudson to engage in the Strategy and to rectify Defendants' wrongdoing, for tax savings and investment opportunities lost as a result of Defendants' conduct, for the disallowance/loss of certain other deductions, and for the cost of the HOMER Contracts purchased and Loans taken out to effectuate the HOMER Strategy, plus punitive damages, attorneys' fees and costs;

J.    As to Count IX (Civil Conspiracy): A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

K.    Against each Defendant, actual, punitive, and exemplary damages, attorneys' fees, costs, interest, and such other and further relief as the Court may deem just and proper; and

L.    That the Court grant such other, further, and different relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

By: _____

Robert J. Weber
LAW OFFICE OF ROBERT J. WEBER
30 N. LaSalle Street, Suite 2900
Chicago, IL  60602
(312) 499-4500
Firm ID No. 25892
LOCAL COUNSEL FOR PLAINTIFFS

DEARY MONTGOMERY DEFEO &
CANADA, L.L.P.

_____

DAVID R. DEARY.
W. RALPH CANADA, JR.
STEWART CLANCY
JEVEN R. SLOAN
Chateau Plaza, Suite 1565
2515 McKinney Avenue
Dallas, Texas  75201
(214) 292-2600
(215) 739-3879 (fax)

LEAD ATTORNEYS FOR PLAINTIFFS

WHATLEYDRAKE, LLC
JOE R. WHATLEY, JR.
OTHNI LATHRAM
2323 2nd Avenue North
Birmingham, Alabama 35203
(205) 328-9576
(205) 328-9669 (fax)

ATTORNEYS FOR PLAINTIFFS

CORY WATSON CROWDER & DEGARIS
ERNEST CORY
2131 Magnolia Avenue
Birmingham, Alabama 35205
(205) 328-2200
(205) 324-7896 (fax)

ATTORNEYS FOR PLAINTIFFS

84

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

---------------------------------------------------------x
                            :

ARLESS HUDSON, *et al.*,
                            :

                **Plaintiffs,**      :        **NO. 2005 CH 16856 (PLB)**

**v.**                            :

**DEUTSCHE BANK AG,** *et al.*,
                            :

                **Defendants.**     :

---------------------------------------------------------x

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on *Tuesday, November 15,* 2005, at *9:30*

**a.m.** or as soon thereafter as counsel may be heard, counsel for Defendants Deutsche

Bank AG, Deutsche Bank Securities, Inc., Craig Brubaker and David Parse shall appear

before the Honorable Philip L. Bronstein, or any judge sitting in his stead, in **Room 2402,**

of the Circuit Court of Cook County, Illinois, County Department, Chancery Division,

and then and there present the attached **Unopposed Motion to Enter Stipulation**

**Regarding Extension of Time,** a copy of which is hereby served upon you.

**DATED:**     November 8, 2005

                            FREEMAN FREEMAN & SALZMAN, PC

                            By:                    

                                Jerrold E. Salzman

                                Joseph P. Adamczyk

                            401 North Michigan Avenue, Suite 3200
                            Chicago, Illinois 60611-4207
                            Telephone: (312) 222-5100
                            Facsimile: (312) 822-0870

                            *Attorneys for Deutsche Bank AG and*
                            *Deutsche Bank Securities Inc., Craig*
                            *Brubaker and David Parse*

**CERTIFICATE OF SERVICE**

The undersigned counsel for Defendants Deutsche Bank AG, Deutsche Bank Securities, Inc.,

Craig Brubaker and David Parse, hereby certifies that on November 8, 2005, true and correct copies

of the foregoing **NOTICE OF MOTION, UNOPPOSED MOTION TO ENTER STIPULATION**

**REGARDING EXTENSION OF TIME, [PROPOSED] ORDER** and **APPEARANCE** were

served by Messenger or Federal Express upon the following counsel of record on the attached

Service List:

Joseph P. Adamczyk

## SERVICE LIST
### Arless Hudson, et al. v. Deutsche Bank AG, et al., No. 05 CH 16856 (PLB)

**Attorneys for Plaintiffs**
Robert J. Weber
Law Office of Robert J. Weber
30 N. LaSalle Street, Suite 2900
Chicago, Illinois 60602
Tel: 312-499-4500

David R. Deary
W. Ralph Canada, Jr.
Stewart Clancy
Jeven R. Sloan
Deary Montgomery Defeo & Canada, L.L.P.
Chateau Plaza, Suite 1565
2515 McKinney Avenue
Dallas, Texas 75201
Tel: 214-292-2600
Fax: 215-739-3879

Joe R. Whatley, Jr.
Othni Lathram
WhatleyDrake, LLC
2323 2nd Avenue North
Birmingham, Alabama 35203
Tel: 205-328-9576
Fax: 205-328-9669

Ernest Cory
Cory Watson Crowder & Degaris
2131 Magnolia Avenue
Birmingham, Alabama 35205
Tel: 205-328-2200
Fax: 205-324-7896

**ATTORNEYS FOR DEFENDANTS:**

**Attorneys for Banc One Investment Advisors n/k/a JPMorgan Chase; Bank One Corp. n/k/a JPMorgan Chase; and American National Bank & Trust, n/k/a JPMorgan Chase**
Thomas M. Durkin
Daniel G. Hildebrand
J. Gregory Deis
Mayer, Brown, Rowe & Maw LLP
71 S. Wacker Drive
Chicago, Illinois 60606
Tel: 312-706-0600
Fax: 312-701-7711

**Attorneys for Deutsche Bank AG and Deutsche Bank Securities, Inc.,**
Lawrence M. Hill
Seth C. Farber
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel: 212-259-8000
Fax: 212-259-6333

**Attorneys for Craig Brubaker and David Parse**
Susan Brune
Theresa Trzaskoma
BRUNE & RICHARD LLP
80 Broad Street
New York, NY 10004
Tel: (212) 668-1900
Fax: (212) 668-0315

**Attorneys for Scott Deichmann, Jeffrey Conrad, and Jeff Ohle, III**
David J. Stetler
Stetler & Duffy, Ltd.
11 S. LaSalle Street, Suite 1200
Chicago, Illinois 60603
Tel: 312-338-0200
Fax: 312-338-0070

**Attorneys for White & Case LLP**

David J. Bradford
David C. Layden
Jenner & Block LLP
One IBM Plaza
Chicago, Illinois 60611-7603
Tel: 312-923-2975
Fax: 312-840-7375

2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

------------------------------------------------x

ARLESS HUDSON, *et al.*,      :

          **Plaintiffs,**    :     NO. 2005 CH 16856 (PLB)

v.                          :

DEUTSCHE BANK AG, *et al.*,    :

         **Defendants.**    :

------------------------------------------------x

## UNOPPOSED MOTION TO ENTER
## STIPULATION REGARDING EXTENSION OF TIME

Pursuant to Illinois Supreme Court Rule 183, Defendants Deutsche Bank AG, Deutsche Bank Securities Inc. d/b/a Deutsche Bank Alex. Brown (collectively "Deutsche Bank"), Craig Brubaker and David Parse, through their undersigned attorneys, hereby respectfully move this Court to enter their Motion to Enter Stipulation Regarding Extension of Time. Plaintiffs do not oppose this motion. In further support thereof, Deutsche Bank states as follows.

1. Plaintiffs have agreed to extend the time within which Deutsche Bank, Craig Brubaker and David Parse may answer, move or otherwise respond to the Complaint to and including January 3, 2006. In furtherance thereof, Plaintiffs and Deutsche Bank entered into the Stipulation attached hereto as Exhibit A. A Proposed Order is also included.

2. Deutsche Bank, Craig Brubaker and David Parse have not made a request for an extension of time in this case.

**Conclusion**

WHEREFORE, Deutsche Bank, Craig Brubaker and David Parse pray this

Court to enter the attached Stipulation and Proposed Order.

**DATED:**        November 8, 2005

FREEMAN FREEMAN & SALZMAN, PC

By: _____
        Jerrold E. Salzman
        Joseph P. Adamczyk

401 North Michigan Avenue, Suite 3200
Chicago, Illinois 60611-4207
Telephone: (312) 222-5100
Facsimile: (312) 822-0870

*Attorneys for Deutsche Bank AG, Deutsche*
*Bank Securities Inc., Craig Brubaker and*
*David Parse*